ST. PAUL, J.
 

 Plaintiff and defendant are both “Turkish merchants,” residing in this city. Mention is made of this fact because the Western mind is not always able to appreciate and follow the psychology of the East.
 

 Some 20 witnesses were examined in the ease, nearly the same number on each side, all of whom were Orientals,. save one. The witnesses for one side tell one story; the witnesses for the other tell/ another and diametrically opposite story.
 

 
 *77
 
 The testimony for both sides has
 
 the ring of truth about it;
 
 but assuredly the witnesses cannot
 
 all be
 
 telling the truth. For if the testimony given for one side be
 
 true,
 
 then it seems that the testimony given for the other side
 
 must be false,
 
 and vice versa. Tet, who (being' himself unskilled in the ways of Asiatic civilization) can tell which is which?
 

 And yet it is
 
 essential
 
 for a disposal of this controversy to fathom and solve just that
 
 enigma;
 
 for the case presents nothing but a question of fact.
 

 I.
 

 • Plaintiff claims that
 
 "on or about October 6, 1917,”
 
 he entered into a verbal agreement with defendant by which he was to be employed as a general clerk in defendant’s emporium, his compensation to be his board and lodging and
 
 "a reasonable sum in money per month”;
 
 that he remained in defendant’s employ continuously from then until July 30, 1921; that he was boarded and lodged as agreed, but received
 
 no money
 
 for his services at any time; that it was his intention to accumulate in time sufficient money to take back with him to Calcutta, in India, whence he originally came;
 
 that at various times he requested of defendant payment for his services, staging that he wanted to put his money in bank at 'interest, but was told by defendant that this was “unnecessary as he (defendant) could keep the money for petitioner which ivas just the same as putting it in
 
 bank”; that on July 20,1921, he asked defendant for a small sum ($15) which he 'desired to send to a needy relative in India, but was told by defendant that he (defehdant) had no money, and could not help him (plaintiff); that, thereupon he was
 
 advised by several friends
 
 that defendant meant to cheat him out of all the money due him, and he should “resign”; that on July 30, 1921 (ten days later), he did resign, “never receiving a nickel from defendant for salary due him from the time he was employed until the day of his resignation.”
 

 Plaintiff further claims that
 
 on November 26, 1919,
 
 he was requested by defendant to accompany him to a lawyer’s office because he had need of his presence there; that upon arriving at the lawyer’s office he was presented with a paper to sign, which, though read to him, he did not understand (because he speaks and understands very little English); that he asked defendant what the meaning thereof was, and was told that “everything would be explained to him after the affair was concluded”; that, having faith and entire confidence in defendant,
 
 he signed the document
 
 without knowing or Understanding what it meant; that when he
 
 subsequently
 
 asked for an explanation he was given by defendant “a cock and bull story” about defendant having a number of enemies amongst his countrymen, and that in order to protect himself against their jealousies it was necessary to execute this paper showing that there was
 
 no partnership
 
 between plaintiff and defendant, “with which explanation plaintiff
 
 had to be satisfied”',
 
 that upon recent investigation “it was found” that the document purported to be an agreement whereby plaintiff “acknowledged payment of all moneys due him by defendant, by reason of his employment or otherwise, and releasing said defendant from any amounts so due”; that the said document was a notarial act, dated
 
 November 28, 1919,
 
 which plaintiff was “inveigled, and
 
 forced
 
 into signing * * * against his will and without understanding in the least” the purport thereof, and which “defrauds and cheats petitioner out of his rights, without considerations and
 
 against his free will.”
 
 (All italics ours.)
 

 Wherefore plaintiff claims $150 per month from October 6, 1917, to July 31, 1921.
 

 
 *79
 
 II.
 

 The defense is substantially the general issue, except that defendant stancls on the act signed on November 28, 1919, and avers that he paid plaintiff from month to month the salary due him. He also reconvenes for $243.90 on a demand note dated July 20,1918.
 

 III.
 

 It is difficult indeed to weave a web so intricate that no one can be found who is able to untangle it; for in general it suffices merely to find some loose end, and the thread then unravels almost by itself.
 

 In the present case there is not only
 
 one
 
 loose end, but there are several. ’
 

 (1) The first is that plaintiff has proved
 
 entirely too
 
 much; and his
 
 allegata,
 
 and the
 
 probata
 
 do not even correspond, thus: His petition declares positively (where italicized) that the contract of employment was for “a reasonable sum in money per month,” and that when he “at various times” demanded his pay to pilt it in bank it was
 
 then
 
 that defendant told him he would keep it for him. His
 
 proof
 
 is equally positive that the agreement was for
 
 $25 per month,
 
 and that it was agreed
 
 from the beginning
 
 that defendant should keep his pay until plaintiff was ready to return home.
 

 (2) His petition and his
 
 proof
 
 are
 
 positive
 
 that the employment was entered into “verbally” in
 
 October, 1917.
 
 It is now admitted, and shown by indisputable documentary evidence, that defendant was, away on a pilgrimage to Mecca all during the year 1917; that he reached Hong Kong on his way to Calcutta about November 14, 1916, and left I-Iong Kong on his way to San Francisco about April 10, 1918, during which time
 
 it is admitted
 
 that plaintiff was left in charge of defendant’s business and collected certain amounts due defendant, for which he did not account and for 'which he gave the note herein sued upon in reconvention. (Defendant was then
 
 discharged,
 
 and re-employed later.)
 

 (3)It is testified
 
 by
 
 the notary before whom the “agreement” was passed that it was fully explained to plaintiff, and that two days elapsed before plaintiff signed it; and in this he is
 
 corroborated
 
 by plaintiff’s sworn petition that he first went to the notary’s office on
 
 November 26th,
 
 and the act was signed only on
 
 November 28th,
 
 and also
 
 by
 
 the testimony of plaintiff’s own witnesses that he (plaintiff) was giving out that he was defendant’s
 
 partner;
 
 the denial of this last being the main purpose of the act, and the acknowledgment of payment being merely incidental (and, we believe,
 
 true,
 
 gee, also, Snell v. Union Sawmill Co.,
 
 105 So. 729,
 
 par. V, 159 La. 604).
 

 There are also other “loose ends,” but these will suffice.
 

 IV.
 

 A jury thought the plaintiff was entitled to $1,600; the trial judge thought this was excessive, and that plaintiff should receive only $500; our own conclusion is that plaintiff was paid from month to month as testified to by defendant, and that he is entitled to nothing more.
 

 Decree.
 

 The judgment appealed from is amended by rejecting plaintiff’s demand, and as thus amended it is affirmed at plaintiff’s cost in both courts.
 

 O’NIELL, C. J., dissents, being of the opinion that the plaintiff was defrauded by the documents dated November 28, 1919.